THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Heidi A. Williams
W194N16045 Hickory Ln.
Jackson, WI 53037,

    Plaintiff,

v.

County of Racine
730 Wisconsin Ave., 10th Floor
Racine, WI 53403,

Christopher Schmaling,
Racine County Sheriff, in his official capacity
717 Wisconsin Ave.
Racine, WI 53403,

John Doe No. 1,
Jane Doe No. 1,
John Doe No. 2,
Jane Doe No. 2,
Jane Doe No. 3,

    Defendants.

Case No. 18-cv-1020
Jury Trial Demanded

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Heidi A. Williams ("Williams"), by her attorneys, Pines Bach LLP, as a complaint against Defendants County of Racine ("the County"), Christopher Schmaling ("Schmaling"), John Doe No. 1, Jane Doe No. 1, John Doe No. 2, Jane Doe No. 2, and Jane Doe No. 3, alleges as follows:

## INTRODUCTION

1. This action is a claim for compensatory and punitive damages and attorneys' costs and fees, brought pursuant to 42 U.S.C. §§ 1983 and 1988, for violations by Defendants, acting under the color of state law, of Williams' right, under the Fourth and Fourteenth Amendments to the United States Constitution, to receive objectively reasonable medical attention while in the custody of the County and its Sheriff.

## JURISDICTION & VENUE

2. This Court has original jurisdiction over the claims made in this complaint pursuant to 28 U.S.C. § 1331, because the cause of action arises under the United States Constitution and 42 U.S.C. § 1983. Venue in this Court is appropriate pursuant to 28 U.S.C. § 1391(b), because the events or omissions giving rise to this claim occurred in the Eastern District of Wisconsin.

## PARTIES

3. Plaintiff Heidi A. Williams ("Williams") is an adult resident of the State of Wisconsin who lives at W194N16045 Hickory Ln., Jackson, Wisconsin 53037.

4. Defendant County of Racine ("the County") is a county of the State of Wisconsin. Its central offices are located at 730 Wisconsin Avenue, Racine, Wisconsin, 53403.

5. Defendant Christopher Schmaling ("Schmaling") is, and at all times material to this complaint was, the Sheriff of Racine County whose address is 717 Wisconsin Avenue, Racine, Wisconsin 53403. He is sued in his official capacity.

6. Defendants John Doe No. 1, John Doe No. 2, Jane Doe No. 1 and Jane Doe No. 2 are Racine County Sheriff's Deputies being sued in their individual capacities. At all times relevant to this Complaint, John Doe No. 1, John Doe No. 2, Jane Doe No. 1, and Jane Doe No. 2 were guards acting under color of State of Wisconsin law within the scope of their employment with the County. Their actual identities and home addresses are currently unknown to Williams.

7. On information and belief, Defendant Jane Doe No. 3 is a contract employee who provides health care services in the Racine County Jail, who operates under the direction and control of the Racine County Sheriff. She is being sued in her individual capacity. At all times relevant to this Complaint, Jane Doe No. 3 was acting under color of State of Wisconsin law within the scope of her employment with the County. Her actual identity and home address is currently unknown to Williams.

**FACTS**

8. The Racine County Jail ("RCJ") is one of the largest pre-detention facilities in the State of Wisconsin and claims to provide health services to individuals in its custody.

9. At all times material to this complaint, the RCJ was owned and operated by the County of Racine under the control and supervision of the Defendant, Racine County Sheriff, Christopher Schmaling, who set and determined policies for the RCJ and was responsible for the supervision and training of all individuals working within the RCJ, including but not limited to the provision of medical services to individuals

brought to the RCJ and placed in a holding cell while awaiting booking following an arrest.

10.     In February of 2013, Williams was diagnosed with seropositive rheumatoid arthritis ("RA"), a chronic inflammatory disorder that affects not only the joints, but also a wide variety of body systems including the skin, eyes, lungs, heart and blood vessels.

11.     Within six weeks of Williams' diagnosis and commencement of a treatment plan of daily NSAIDS (etodolac – 400mg 2x per day) and weekly methotrexate (2.5 mg tablets – 8 tablets 1x per week on Thursday evening at 7pm), her RA was in a state of remission, showing no active disease.

12.     Because Williams consistently followed her treatment plan, her RA remained in remission until October 12, 2017.  During this time, she was treated twice for periodic palindromic attacks at local hospitals with prompt injections of ketorolac, which goes by the brand name Toradol.  Within 20 minutes of injection, the attacks had diminished, and no lasting joint damage occurred.

13.     Upon diagnosis, Williams' RA specialist informed her the best chance of achieving and remaining in remission was to aggressively treat her disease with medications that needed to be taken regularly and at approximately the same times each day.

14.     On Thursday, October 12, 2017, Williams was arrested by an officer of the Racine Police Department ("RPD") in the parking lot of the school district's office where

she worked because, allegedly, she had carried a pocket knife with a 3-inch blade onto the grounds of a school.

15. RPD officers took Williams to the RCJ, where Williams was transferred to the custody of jail and at approximately 4:00 p.m. was placed in a holding cell to await booking. Prior to placing Williams in the holding cell, Jane Doe No. 1 told Williams that she would not have to wait long for the booking process to be completed and that she would be released on bail after the booking took place.

16. In her intake interview, Williams disclosed to Jane Doe No. 1 that she had RA and informed her of all medications she took for that disease. Jane Doe No. 1 typed this information into her computer.

17. Williams surrendered her purse to Jane Doe No. 1 and informed Jane Doe No. 1 that she kept a pill container in her purse with all of her medications in it. The purse was, at all relevant times thereafter, in the custody of the RCJ. The jail personnel had access to it.

18. When Jane Doe No. 1 led Williams to her holding cell, Williams repeated her concern to Jane Doe No. 1 that she was immunosuppressed.

19. At approximately 6:15 p.m., Jane Doe No. 2 came to the holding cell where Williams was being held with other individuals. Williams told Jane Doe No. 2 that she suffered from RA and that she needed to take methotrexate at or near 7:00 p.m. and that the medication was in her purse. Jane Doe No. 2 stated that she would let the nurse know of this need.

20. At approximately 6:30 p.m., Jane Doe No. 2 returned to the holding cell and asked Williams how to spell the name of the requested medication. Williams gave her the correct spelling. Jane Doe No. 2 then told Williams that the nurse would get back to her.

21. At approximately 7:15 p.m., Williams began to feel ill. One of her cellmates noticed this and asked her if she felt OK. Williams reported that she felt as though her heart was racing. The cellmate counseled Williams to take deep slow breaths.

22. About five minutes later, Williams began to experience an attack of palindromic rheumatism. Her tendons painfully tightened up, and her heart rate continued to increase.

23. A cellmate immediately began to pound on the cell door and repeatedly shout "medical emergency."

24. Several minutes passed but no one responded to the holding cell.

25. By then, Williams had situated herself on all fours on the floor of her cell to try to control her breathing. A second cellmate began to pound on the cell door and shout that there was a medical emergency. Williams' cellmates also repeatedly pushed a button in the cell that was to be used to alert the jail staff of a medical emergency but no jail personnel responded.

26. Williams' breathing continued to become more difficult over the next several minutes.

27. Williams asked her cellmates how many times they had pushed the emergency button and they indicated that it was at least five or six times. Williams then crawled to the cell door to loudly knock on it and called "please help me." She repeated the banging cycle three times, pausing between each round for at least three to five minutes to gather her strength to try again.

28. Williams' husband, Jeffrey S. Williams, who was by this time at the jail to post bail for Williams and pick her up, could hear this banging from the waiting area, though he did not know at the time that it was his wife who was causing the noise.

29. One cellmate who, while continuing to pound on the cell door and shout about Williams having a medical emergency, saw a guard right outside the cell door. Despite that guard's physical proximity, the guard continued to ignore Williams' medical condition.

30. The guard who was immediately outside the cell was either John Doe No. 1, John Doe No. 2, or Jane Doe No. 2. After several more minutes during which Williams called for help and gasped for air, the guard, now joined by the others, so that John Doe No. 1, John Doe No. 2, or Jane Doe No 2 were all present, finally opened a slot opening on her cell door.

31. Through the slot, Williams was able to tell them that her heart was racing and that she had medically documented tachycardia and needed medication to bring it down. John Doe No. 1 stated that he also had this condition and that she should concentrate on taking deep breaths.

32. After Williams' cellmates pleaded with the guards, John Doe No. 1, John Doe No. 2, or Jane Doe No 2, to fully open the door to give Williams some air, the guards did so. Williams then explained to the guards, John Doe No. 1, John Doe No. 2, or Jane Doe No. 2, that she could not take deep breaths because her RA attack had stiffened her diaphragm along with her hands, and she needed her medication to treat the effects of her RA.

33. John Doe No. 2 informed Williams that she must walk under her own power to the bench that was about 15-20 feet away. Williams stated that she was unable to do so.

34. After that, the guards, John Doe No. 1, John Doe No. 2, and Jane Doe No. 2, simply observed Williams for another several minutes, after which John Doe No. 2 finally helped Williams move to the bench. Standing by the bench was Jane Doe No. 3, who had wheeled in a pole that had some type of medical equipment attached to it. However, despite the fact that Williams was crying and pleading for help, neither Jane Doe No. 3 nor any other jail personnel administered Williams' medication, called for emergency medical personnel or an ambulance, or used any available medical equipment to help Williams.

35. Jane Doe No. 3 then yelled at Williams to slow down her breathing and to take deep breaths. Williams tried to inform her that because of her RA she was unable to do so, but Jane Doe No. 2 continued to yell the same instruction at Williams, and did nothing else.

36. Then Williams asked Jane Doe No. 3 to take her heart rate. Jane Doe No. 3 reluctantly acquiesced, finding Williams' heart rate to be 151.

37. At that point, either John Doe No. 1, John Doe No. 2, or Jane Doe No. 2, finally stated that Williams would be booked so that she could leave the RCJ. John Doe No. 1, John Doe No. 2, and Jane Doe No. 2 had to assist in dressing Williams in a white shirt and moving her hair to facilitate photographing her because Williams could not do so herself.

38. Williams' RA attack had affected her hands so severely that they were stuck in a clenched position. As a result, John Doe No. 2 had to pry open Williams' fingers in order to record her fingerprints. After he had taken five prints, Williams asked how many more prints were needed and told John Doe No. 2 that she needed to go to the emergency room as soon as possible to get treatment. However, John Doe No. 2 ignored her, and proceeded to continue prying Williams' fingers open to take over 30 more prints.

39. Williams reported to John Doe No. 1 that she needed to go to the hospital to get a shot of Toradol, but he ignored her and did not call an ambulance or arrange for any transportation to a hospital.

40. Jane Doe No. 2 then had to assist Williams in changing from her jail uniform into her civilian clothing and shoes. Williams was unable to even pull up her undergarments without assistance.

41. Williams repeated to them that she was continuing to suffer an attack and needed to go to the hospital, but John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane

Doe No. 2, and Jane Doe No. 3 did nothing and continued to make her wait at the booking room counter.

42. While standing by a central desk area in the RCJ, no more than 25 feet from the public front exit where her husband was waiting, Williams multiple times begged John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 to call an ambulance and repeatedly asked them why they were ignoring her pleas for help. They ignored her. Instead, John Doe No. 1 simply stated that they were waiting for her husband to post the bail and then she would be free to go.

43. Finally, after Williams had been in custody for approximately four hours, Jane Doe No. 2 assisted Williams to an RCJ exit, as Williams was unable to walk without assistance. However, instead of releasing Williams through the public, front exit of the RCJ where Williams' husband was waiting for her release after he had posted her bail, Jane Doe No. 2 led Williams out of the RCJ through a much longer, narrow corridor leading out to a non-public, rear exit.

44. The RCJ has security cameras that record people entering and exiting its front entrance to the secured part of the RCJ. It does not have such cameras at the back exit of the RCJ where Jane Doe No. 2 took Williams out of the RCJ.

45. Once outside the RCJ, Williams collapsed on the sidewalk. Jane Doe No. 2 left Williams there in that state. A few minutes later, Jane Doe No. 2 came around an outside corner of the RCJ with Jeffrey Williams, to find Williams still lying *in extremis* on the ground.

Case 2:18-cv-01020-LA    Filed 07/03/18    Page 10 of 16    Document 1

10

46. Jeffrey Williams took Williams into his arms. Williams told him that she needed to go to the hospital because she could not breathe and was still suffering from an RA attack. At Jeffrey Williams' request, Jane Doe No. 2 stayed with Williams while Jeffrey Williams went to retrieve his car.

47. Upon returning with the car, Jeffrey Williams immediately put Heidi Williams into it and took her to Wheaton Franciscan Healthcare in Racine, where she received treatment.

48. Williams' treatment at the hospital, including an injection of Toradol, resolved the immediate symptoms of her acute palindromic rheumatism attack within approximately 20 minutes.

49. However, the length of the palindromic rheumatism attack, the stress caused by it and Defendants' failure to attend to Williams' need for medical care caused Williams' RA to flare into an active state with permanent joint damage. Her active state of RA, not in remission, continues to this day and is permanent.

50. Had Williams received treatment for her medical needs promptly, the effects of her palindromic rheumatism attack would have been terminated earlier, the episode would have been substantially less stressful, and the movement of her RA out of remission would have been prevented.

51. Because her RA is not in remission and is causing Williams pain and physical disability, Williams has been unable to continue in her previous employment as a principal, which has caused her to lose wages and benefits and has diminished her future earning capacity.

52. Williams' RA now keeps her from accomplishing basic life activities. She has and continues to suffer from emotional distress including, but not limited to post-traumatic stress disorder. Her emotional distress is likely to be permanent.

**FIRST CAUSE OF ACTION AGAINST DEFENDANTS JOHN DOE NO. 1, JANE DOE NO. 1, JOHN DOE NO. 2, JANE DOE NO. 2 AND JANE DOE NO. 3 FOR VIOLATING WILLIAMS' 4th AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION**

53. Williams re-alleges the statements in paragraphs 2 through 52 above as if fully stated herein.

54. Williams' RA and the attack of palindromic rheumatism that she suffered while in the custody of Defendants were serious medical conditions.

55. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 had notice of Williams' need for medical assistance resulting from Williams' serious medical conditions.

56. The scope of Williams' requested treatment including, but not limited to, assessing her symptoms, responding to her medical emergency, allowing her to take her prescribed methotrexate, and facilitating her prompt transportation to a hospital emergency room where she could receive Toradal to alleviate the symptoms of her palindromic rheumatism attack, was neither onerous nor unreasonable under the circumstances.

57. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 did not have an interest that outweighed the need to respond to Williams' medical needs.

58. The actions of John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 were not objectively reasonable responses to Williams' medical needs.

59. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3's actions, individually, were done under color of state law and while Williams was in their custody.

60. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3's failure, individually, to engage in an objectively reasonable response to Williams' serious medical conditions and need for medical care violated Williams' right, under the Fourth and Fourteenth Amendments to the U.S. Constitution, to freedom from unreasonable seizure.

61. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3's failure, individually, to engage in an objectively reasonable response to Williams' serious medical conditions and need for medical care caused Williams' injuries.

62. John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3's failure, individually, to engage in an objectively reasonable response to Williams' serious medical conditions and need for medical care displayed on their part a reckless or callous indifference to Williams' constitutionally protected right to be free from unreasonable seizure that should be sanctioned by punitive damages.

## SECOND CAUSE OF ACTION AGAINST DEFENDANTS COUNTY OF RACINE AND SHERIFF CHRISTOPHER SCHMALING FOR VIOLATING WILLIAMS' 4th AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION

63. Williams re-alleges the statements in paragraphs 2 through 62 above as if fully stated herein.

64. Racine County ("the County") and Sheriff Christopher Schmaling ("the Sheriff") failed to adequately train and/or otherwise supervise John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 regarding their obligation to provide, or cause to be provided, medical services to individuals being held in custody in the RCJ awaiting booking, the proper handling of medication administration for individuals being held in custody in the RCJ awaiting booking, and the proper response to emergent medical conditions of individuals being held in custody in the RCJ awaiting booking.

65. The County's and the Sheriff's failure in training and/or supervision were plainly obvious through the utter failure of John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 to pay any attention whatsoever to the fact that Williams told them that she suffered from RA, took medication for RA that she needed to take by 7 p.m. and needed medical care when she started to have an attack of palindromic rheumatism.

66. The violation of Williams' right to receive necessary medical attention while in the custody of the County and the Sheriff was a highly predictable consequence of their failures in the training and/or supervision of John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3.

67. The County and the Sheriff made deliberate policy choices by failing to provide the appropriate training and/or supervision of John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3.

68. The County's and the Sheriff's failure to properly train and supervise John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 caused Williams' injuries and were the moving forces behind the unconstitutional deprivation of Williams' constitutional right to receive necessary medical attention while in custody prior to a probable cause hearing.

69. The County's and the Sheriff's failure to properly train and supervise John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 resulted in their deliberate indifference to Williams' medical needs and that deliberate indifference violated Williams' rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff Heidi A. Williams requests judgment as follows:

A. On the First Cause of Action against the Defendants John Doe No. 1, John Doe No. 2, Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3, individually, as follows:

1. Compensatory and punitive damages;

2. Pursuant to 42 U.S.C. § 1988, reasonable attorneys' fees, expenses, and statutory costs and fees; and

3. Such other relief as the Court may deem just and proper.

B. On the Second Cause of Action against the Defendants County of Racine and Sheriff Christopher Schmaling, jointly and severally, as follows:

1. Compensatory and punitive damages;

2. Pursuant to 42 U.S.C. § 1988, reasonable attorneys' fees, expenses, and statutory costs and fees; and

3. Such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Heidi A. Williams demands a trial by jury.

Respectfully submitted this 3rd day of July, 2018.

PINES BACH LLP

*/s/ Lester A. Pines*                              .
Lester A. Pines, SBN 1016543
Aaron G. Dumas, SBN 1087951

*Attorneys for Heidi A. Williams, Plaintiff*

Mailing Address:
122 West Washington Avenue
Suite 900
Madison, WI 53703
(608) 251-0101 (telephone)
(608) 251-2883 (facsimile)
lpines@pinesbach.com
adumas@pinesbach.com